**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

K.D. a minor child, through his
mother and next friend, C.L.,
       *Plaintiff-Appellant,*

v.

DEPARTMENT OF EDUCATION,
STATE OF HAWAII,
       *Defendant-Appellee.*

No. 10-15454

D.C. No.
1:09-cv-00197-HG-
LEK

OPINION

Appeal from the United States District Court
for the District of Hawaii
Helen W. Gillmor, Senior District Judge, Presiding

Argued and Submitted
October 13, 2011—Honolulu, Hawaii

Filed December 27, 2011

Before: Diarmuid F. O'Scannlain, Richard C. Tallman, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

**COUNSEL**

Matthew Charles Bassett (argued), Hawaii Disability Rights Center, Kula, Hawaii, for plaintiff-appellant K.D.

Berton Kato, Deputy Attorney General (argued), Honolulu, Hawaii, for defendant-appellee Department of Education, State of Hawaii.

## OPINION

M. SMITH, Circuit Judge:

Plaintiff-Appellant K.D., a minor who has been diagnosed with autism, appeals the district court's affirmance of the Hawaii Department of Education (DOE) hearing officer's decision that K.D.'s free and appropriate public education placement complied with the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.* K.D. also claims that his tuition reimbursement request for the 2007-08 school year was timely, and that Loveland Academy (Loveland) was his "stay put" placement. We affirm the decision of the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.   Statutory Framework

The IDEA ensures that "all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). The IDEA primarily seeks to make public education available to handicapped children who were previously excluded from any form of public education. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 191-92 (1982). In particular, the IDEA aims to address concerns about the "apparently widespread practice of relegating handicapped children to private institutions or warehousing them in special education classes." *N.D. v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1115 (9th Cir. 2010) (citing *Sch. Comm. of the Town of Burlington v. Mass. Dep't of Educ.*, 471 U.S. 359, 373 (1985)). On the other hand, the IDEA aims to ensure that handicapped children are provided public education appropriate for their needs, and are not "left

to fend for themselves in classrooms designed for education of their non[-]handicapped peers." *Rowley*, 458 U.S. at 191.

A free and appropriate public education (FAPE) is defined as "special education and related services that—(A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this title." 20 U.S.C. § 1401(9). In order to provide children with a FAPE, schools and parents work together to develop an individualized education program (IEP). *Schaffer v. Weast*, 546 U.S. 49, 53 (2005). An IEP is defined as a "written statement for each child with a disability that is developed, reviewed, and revised in accordance with section 1414(d) of this title." 20 U.S.C. § 1401(14). The IEP is, in effect, a "comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services to be employed to meet those needs." *Burlington*, 471 U.S. at 368.

A state must comply both procedurally and substantively with the IDEA. *Amanda J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 881 (9th Cir. 2001). While the IDEA does not define the particular substantive level of education that must be provided to a child, the state must provide an education that is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206-07. The IDEA focuses on a set of extensive procedures that must be followed in formulating an IEP for a particular child. *See* 20 U.S.C. § 1414. In addition, the IDEA sets forth a set of procedural safeguards that help ensure that a child receives a FAPE. *See id.* § 1415. A child may file a timely complaint and request a due process hearing for any violation of the IDEA. *Id.* § 1415(b), (f). During the pendency of the due process hearing, the child is entitled to stay put at his "then-current educational placement,"

regardless of the eventual outcome of the hearing. *Id.* § 1415(j).

## II.  Factual Background

K.D. is a ten-year-old boy who has been diagnosed with moderate to severe autism. In November 2006, K.D.'s mother, C.L., enrolled him at Loveland, a private school, after he spent his kindergarten year in public school. Subsequently, C.L. filed a request for a due process hearing with the DOE. The DOE and C.L. settled the due process request on March 23, 2007. As part of the settlement agreement, the DOE agreed to pay K.D.'s tuition at Loveland for the 2006-07 school year. In addition to the dismissal with prejudice of the hearing request, C.L. agreed to sign consent forms allowing DOE employees to conduct observations of K.D. at Loveland, and to obtain K.D.'s 2006-07 education records. The settlement agreement also required C.L. to "participate in transition planning for [K.D.] to a Department of Education public school at the end of the 2006-07 school year, if appropriate."

Accordingly, on April 5, 2007, the DOE held the first IEP meeting for K.D. for the 2007-08 school year, with both C.L. and the Loveland placement director in attendance. At the meeting, the parties agreed to continue the meeting until July 2007 due to time constraints. After this initial meeting, the DOE conducted one visit at Loveland on April 19, 2007 to observe K.D. Subsequently, C.L. sent a letter to the DOE placing limitations on future observations of K.D. because she felt that the April 19, 2007 visit had been disruptive to him. The DOE objected to C.L.'s limitations because they did not comply with the settlement agreement, and because it needed to perform assessments in order to prepare for the upcoming IEP meeting. After several delays caused by C.L.'s cancellations of scheduled tests, the tests finally took place in July 2007.

On June 28, 2007, the DOE sent C.L. a letter proposing dates for the continued IEP meeting, and stating that the meet-

ing would be held on July 25, 2007 if C.L. failed to respond. Having received no response to its June 28, 2007 letter, the DOE sent C.L. another letter on July 13, 2011 informing her the meeting would be held on July 25, 2007. On July 25, 2007, the DOE held the second IEP meeting without either C.L. or Loveland's director being in attendance. The DOE finalized the IEP for K.D. for the 2007-08 school year, and sent it to C.L. on July 31, 2007, as the child's FAPE, placing him at Pearl Harbor Kai Elementary School in a small classroom setting.

C.L. did not respond, and re-enrolled K.D. at Loveland for the 2007-08 school year. The DOE sent C.L. several letters between August 2007 and February 2008 regarding the IEP developed for K.D., and warned C.L. that K.D.'s continued enrollment at Loveland was a unilateral decision made by her alone, and that the DOE would not be responsible for any tuition payments or reimbursement for K.D.'s 2007-08 school year enrollment at Loveland. On February 27, 2008, over seven months after the IEP offer was made by the DOE, C.L. finally responded that K.D.'s enrollment at Loveland was not unilateral, and requested that the DOE make tuition payments for K.D. C.L. and the DOE exchanged several letters in which they disagreed concerning whether K.D.'s enrollment at Loveland was unilateral. No due process hearing request was filed by C.L. at that time.

The DOE subsequently began preparing for K.D.'s 2008 IEP. The DOE sent letters to C.L. requesting K.D.'s progress reports from Loveland, and C.L.'s written consent to observe K.D. at Loveland. No written consent was provided to the DOE, though C.L. later testified that she gave the DOE verbal consent. On July 10, 2008, the DOE sent C.L. a letter proposing dates for the 2008 IEP meeting, and stating that the meeting would be held on July 25, 2008 if C.L. failed to respond. Due to another failure to respond, the 2008 IEP meeting was held on July 25, 2008 without either C.L. or Loveland's director being in attendance. The DOE sent the proposed 2008 IEP

to C.L. on August 6, 2008, offering placement at Pearl Harbor Kai for the 2008-09 school year. On August 29, 2008, K.D. filed the request for a due process hearing that is at issue in this appeal.

## III.    Procedural History

### A.    Proceedings Before the Administrative Hearing Officer

The administrative hearing officer issued a written decision on April 3, 2009, in which he concluded that the proposed 2007 IEP was a FAPE. The hearing officer found that the 2007 IEP offered K.D. the following services: 1,530 minutes of special education per week, 1,350 minutes of speech-language therapy per quarter, 540 minutes of occupational therapy services per quarter, and transportation services. Supplemental services were also ordered for K.D., including individualized instructional support during school of 6.25 hours per week, behavioral instructional support services for four hours per week, and a 1:1 paraprofessional support after school for two hours, five times a week. The hearing officer also concluded that the individualized instructional support during school and 1:1 paraprofessional support after school met K.D.'s need for a 1:1 trainer.

Similarly, the hearing officer concluded that the 2008 was a FAPE. The 2008 IEP offered K.D. the following services: 1,740 minutes per week of special education during school and 950 minutes per week after school, 60 minutes of occupational therapy per week, 200 minutes of speech-language therapy per week, and transportation services. Additional services offered included 1,800 minutes of paraprofessional services per week during school and 950 minutes per week after school, four hours of behavioral support services per week, and one hour of parent training per month.

The hearing officer also dismissed K.D.'s claims for tuition reimbursement for the 2007-08 Loveland school year because

K.D.'s enrollment at Loveland after the 2006-07 school year had been a unilateral placement, and the reimbursement request, filed over a year after the placement, was untimely.

## B.    Proceedings in District Court

K.D. filed a timely appeal of the administrative decision in the district court. The primary issues presented to the district court were: (1) whether the DOE's placement of K.D. at Pearl Harbor Kai for the 2007-08 and 2008-09 school years was a denial of a FAPE, and (2) whether IDEA's stay put provision applied to keep K.D. at Loveland during the 2007-08 and 2008-09 school years. The district court affirmed the hearing officer's conclusion that the IEPs offered in 2007 and 2008 were sufficient to constitute a FAPE. The district court also affirmed that the request for reimbursement for the 2007-08 school year was untimely because K.D.'s enrollment at Loveland was unilateral. Finally, the district court held that Loveland was not K.D.'s stay put placement.

## JURISDICTION AND STANDARDS OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291.

We review *de novo* the district court's decision that the school district complied with the IDEA. *N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1207 (9th Cir. 2008). However, we must give "due weight" to judgments of education policy when reviewing state hearings and must take care to "not substitute [our] own notions of sound educational policy for those of the school authorities [we] review." *Seattle Sch. Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1499 (9th Cir. 1996) (internal citation omitted). The extent of deference given to the state hearing officer's determination is within our discretion. *Ashland Sch. Dist. v. Parents of Student R.J.*, 588 F.3d 1004, 1009 (9th Cir. 2009). We give deference to the state hearing officer's findings particularly when, as here, they are

thorough and careful. *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994).

We review the district court's factual determinations for clear error, even when based on the administrative record. *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 949 (9th Cir. 2010). A finding of fact is clearly erroneous when the evidence in the record supports the finding but "the reviewing court is left with a definite and firm conviction that a mistake has been committed." *Burlington Northern, Inc. v. Weyerhaeuser Co.*, 719 F.2d 304, 307 (9th Cir. 1983).

K.D., as the party challenging the district court's ruling, bears the burden of proof on appeal. *Ms. S. ex rel. G. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1127 (9th Cir. 2003).

## DISCUSSION

### I.    K.D.'s Stay Put Placement

**[1]** Before evaluating the substance of the 2007 and 2008 IEPs challenged by K.D., we address K.D.'s argument that he is entitled to stay at Loveland until the termination of these proceedings, pursuant to the stay put provision of the IDEA. The "stay put" provision provides that "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." 20 U.S.C. § 1415(j). K.D. contends that the district court erred in determining that K.D.'s stay put placement was not at Loveland.

### A.    Pre-August 29, 2008 Effect

**[2]** We first hold that K.D. is not entitled to reimbursement based on the stay put provision for the 2007-08 school year. The stay put provision may only be invoked "during the pen-

dency of any proceedings." 20 U.S.C. § 1415(j). Accordingly, the stay put provision does not apply unless and until a request for a due process hearing is filed. *See Zvi D. v. Ambach*, 694 F.2d 904, 906 (2d Cir. 1982) ("This provision is, in effect, an automatic preliminary injunction."). K.D.'s request for a due process hearing was not filed until August 28, 2009. Thus, the stay put provision can have no effect on K.D.'s enrollment at Loveland during the 2007-08 school year or during the 2008-09 school year prior to August 28, 2009—during which no due process hearing was pending.

## B.   Post-August 29, 2008 Effect

[3] Whether the application of the stay put provision of the IDEA requires that K.D. remain at Loveland Academy after the filing of the August 29, 2008 due process hearing request depends on whether Loveland is K.D.'s "current educational placement."[1] 20 U.S.C. § 1415(j). We have previously recognized that the term "current educational placement" is not defined within the IDEA. *N.D.*, 600 F.3d at 1114. "We have interpreted 'current educational placement' to mean 'the placement set forth in the child's last implemented IEP.' We have offered no additional guidance on the issue." *Id.* (internal citation omitted).

The dispute between the DOE and K.D. centers on the effect, if any, of the March 2007 settlement on K.D.'s educational placement. K.D. argues that he was placed at Loveland by the settlement agreement, and that Loveland remained his current educational placement because he continued to attend school and he never accepted any of the subsequent IEPs offered by the DOE. In response, the DOE contends that the settlement agreement only required the DOE to pay K.D.'s

---

[1]The stay put provision potentially applies to a civil action filed in federal district court challenging agency decision, as well as an appeal from the district court's final judgment. *Joshua A. v. Rocklin Unified Sch. Dist.*, 559 F.3d 1036, 1038 (9th Cir. 2009).

Loveland tuition for the 2006-07 school year and did not make Loveland K.D.'s placement for purposes of the stay put provision. We agree with the DOE.

**[4]** We have previously held that a post-placement administrative or judicial determination can operate to define the "current educational placement" of a child. Where a parent unilaterally changes the placement of a child, but a subsequent administrative or judicial decision confirms that the parental placement is appropriate, the decision "constitute[s] an agreement by the State to the change of placement" and the placement becomes the "current educational placement" for the purposes of the stay put provision. *See Clovis Unified Sch. Dist. v. California Office of Admin. Hearings*, 903 F.2d 635, 641 (9th Cir. 1990) (citing *Burlington*, 471 U.S. at 372-73); *see also L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 903 (9th Cir. 2009) ("Where the agency or the court has ruled on the appropriateness of the educational placement in the parents' favor, the school district is responsible for appropriate private education costs regardless of the outcome of an appeal."). However, such a favorable decision for a parent must expressly find that the private placement was appropriate. *See L.M.*, 556 F.3d at 903-04 (finding that there was no implied "current educational placement" because the district court's ruling in favor of the parents was on procedural grounds and the court never adjudicated the appropriateness of the private placement).

**[5]** The cited cases do not apply directly to this case because there was no favorable agency or district court decision agreeing with K.D.'s initial unilateral placement at Loveland. Rather, K.D. urges us to construe the March 2007 settlement agreement as having the same effect. We have never determined whether a settlement agreement may have the same legal effect as an affirmative agency decision to define a student's "current educational placement." However, two cases that have addressed this issue (neither of which is

binding upon us) provide helpful reasoning for our consideration.

In *Zvi D.*, a student was transferred by his parents to a private school, different from the one in which he had been placed by the state. 694 F.2d at 907. After his parents filed a due process hearing request, the Board of Education agreed to provide funding at the new private school for the 1978-79 school year through an agreement that also provided for a review of the student's classification, to be conducted at the end of the school year with a "a view toward placing him in an appropriate public program in September, 1979." *Id.* The agency subsequently reevaluated the student and placed him for the 1979-80 school year at a public school. *Id.* The Second Circuit concluded that the new private school was not the "current educational placement" because the agreement did not constitute "public agency placement" of the student at the school and no agency decision ever determined that the parent's private placement was appropriate. *Id.* at 908. Thus, "during [ ] review of his initial placement, [the student] has a right to a place in a public school or he may remain at [the new private school] at his parent's expense." *Id.* (internal citations omitted). While agreeing that the agency would have been required to pay for the student's private school education had the agency "previously agreed to, or been ordered to provide private school placement," the court stated that "[p]ayment and placement are two different matters." *Id.*

In contrast, K.D. urges us to follow the outcome in *Bayonne Board of Education v. R.S.*, 954 F. Supp. 933 (D.N.J. 1997). In *Bayonne,* an autistic student was originally placed in a public school, but his parents removed him from that school, placed him in a private school, and filed a request for a due process hearing. *Id.* at 935. The due process hearing resulted in a settlement agreement wherein the Board agreed to "undertake the placement" of the student at the private school effective March 1, 1996. *Id.* The settlement agreement further stated that the student would return to public school

starting September 1996, subject to the satisfaction of four-teen conditions. *Id.* at 935-36. The court found the factual sit-uation in *Bayonne* to be distinguishable from that in *Zvi D.* because the *Bayonne* settlement agreement specifically called for "placement." *Id.* at 942 ("Significantly, the child in *Zvi D.* was never placed in the private school—the Board of Educa-tion merely agreed to pay for his tuition until the review of his classification could be conducted."). Moreover, the *Bayonne* court also recognized that the placement did not necessarily end in September 1996 because this transition was subject to the satisfaction of fourteen conditions, and the parties dis-puted whether these conditions had been met. *Id.*

We do not find the reasoning in *Zvi D.* and *Bayonne* to be inconsistent. Both cases involved settlement agreements, but only the *Bayonne* agreement actually "placed" the student, whereas the *Zvi D.* agreement only called for tuition reim-bursement. Furthermore, the *Zvi D.* agreement clearly con-templated transition out of the school at the end of the school year, whereas transition to a public school under the *Bayonne* agreement was subject to the satisfaction of fourteen condi-tions.

**[6]** We find that K.D.'s case is more analogous to the facts in *Zvi D.* than those in *Bayonne*. K.D.'s settlement agreement never called for "placement," and only required tuition reim-bursement. This is not an insignificant semantic difference. Rather, it was logical for the DOE to settle the case by agree-ing to pay tuition for a limited amount of time in order to avoid the costs associated with a full due process hearing. However, it does not follow that, by doing so, the DOE had conducted the detailed evaluation required to determine whether Loveland was the proper educational institution for K.D. under the IDEA.

Moreover, K.D.'s settlement agreement also stated that K.D. would transition to a public school at the end of the 2006-07 school year. This fact stands in stark contrast to the

conditions that had to be satisfied in the *Bayonne* agreement prior to public school placement. Although K.D.'s transition was subject to an "if appropriate" qualifier, the IDEA itself requires that any placement be appropriate and thus, the qualifier cannot be understood as a negotiated limitation on K.D.'s transition. The settlement agreement could only be reasonably read to be time-limited to the 2006-07 school year. The K.D. settlement agreement specified in several places that it applied only to the 2006-07 school year: (1) tuition was to be reimbursed for the 2006-07 school year; (2) DOE's employees were to conduct evaluations of K.D. during the 2006-07 school year; and (3) C.L. was required to consent to observations of K.D., and the release of his educational records at Loveland for the 2006-07 school year. Furthermore, the 2007 IEP proposed by the DOE clearly shows that the DOE did not consider it appropriate for K.D. to remain at Loveland. Thus, the "if appropriate" language cannot reasonably be read to give C.L. the power to unilaterally decide to keep K.D. at Loveland, and expect the DOE to continue paying tuition. Accordingly, K.D.'s stay put placement is not at Loveland because the March 2007 settlement agreement did not place him there, and was limited to the 2006-07 school year.[2]

K.D. next refers us to a Sixth Circuit case, *Thomas v. Cincinnati Board of Education*, 918 F.2d 618, 626 (6th Cir. 1990), for the proposition that "where . . . the dispute arises before any IEP has been implemented, the 'current educational placement' will be the operative placement under which the child is actually receiving instruction at the time the dispute arises." Though this language, read in isolation, may appear helpful to K.D.'s position, a close examination of the

---

[2]K.D. also argues that the placement in *Zvi D.* was made pursuant to an exception to the stay put provision, so it does not apply to this case. The referenced exception states that a student does not have to remain at an educational placement during the pending due process period if the "State or local educational agency and the parents otherwise agree." 20 U.S.C. § 1415(j). We reject this interpretation of *Zvi D.* because the opinion makes no reference to such an exception in its analysis.

case clearly shows that the case is not on point. *Thomas* involved a child who suffered from severe psychomotor retardation, was prone to seizures, and was required to eat through a feeding tube and breathe through a tracheotomy. *Id.* at 621. Cincinnati Public Schools originally provided the child with one hour of home training per week, and changed it to one hour of training per day after a change in state funding regulations. *Id.* at 621-22. The IEP team proposed a placement for the child at an out-of-home program in a nearby school. *Id.* at 621. However, of necessity, the child had to be transported to school and, before the IEP was implemented, a dispute arose over who would bear the cost of transportation, and whether it would be safe to transport the child in her condition. *Id.* Thus, at the time the request for a due process hearing was filed, the child was still receiving at-home care. The court held that the child was to continue receiving at-home care as her stay put placement during the pendency of the proceedings. *Id.* at 626. *Thomas* differs from K.D.'s situation because the at-home care the child was receiving was provided by the state prior to the IEP dispute, and there was no evidence that this prior agreement was time-limited.

**[7]** We acknowledge that the purpose behind the stay put provision of the IDEA is to maintain the status quo. *See, e.g.*, *Thomas*, 918 F.2d at 626. In this case, at the time the due process hearing was filed, K.D. had attended Loveland for over a year without the DOE's permission and in spite of numerous letters from the DOE stating that they would not pay for his continued attendance there. Nothing in the stay put provision prevented K.D. from staying at Loveland. Rather, the issue is who is required to pay for the Loveland tuition during the proceedings. Were K.D. to succeed in this case, and were we to conclude that the DOE denied him a FAPE, K.D. may be eligible to receive tuition reimbursement regardless of the stay put provision. *See Zvi D.*, 694 F.2d at 908 n.8. However, applying the reasoning of both *Zvi D.* and *Bayonne*, we hold that Loveland Academy is not K.D.'s stay put placement because the DOE only agreed to pay tuition for the limited

2006-07 school year, and never affirmatively agreed to place K.D. at Loveland.

## II.   A Free and Appropriate Public Education

Next, we consider whether the district court erred in concluding that the 2007 and 2008 IEPs were offers of a FAPE, and offered K.D. an actual placement. We conclude that K.D.'s tuition reimbursement claim for the 2007-08 school year is time-barred and that the district court did not err in finding that the 2007 and 2008 IEPs comply with IDEA requirements.

### A.   Timeliness of Request for Tuition Reimbursement

[8] K.D. challenges the district court's finding that his request for tuition reimbursement for the 2007-08 school year was time-barred. The IDEA provides an opportunity for any party to seek an impartial hearing, and permits a state to set the timeline for when such a request must be filed. 20 U.S.C. § 1415(b)(6)(B). Hawaii has set a timeline for the filing of a request seeking a due process hearing, in Hawaii Revised Statutes Section 302A-443. The statute, in relevant part, read as follows during the 2007-08 school year:

(a) An impartial hearing may be requested by any parent or guardian of a child with a disability, or by the department, on any matter relating to the identification, evaluation, program, or placement of a child with a disability; provided that the hearing is requested:

   (1) Within two years of the date the parent, guardian, or department knew or should have known about the alleged action that formed the basis of the request for a hearing; and

   (2) Notwithstanding paragraph (1), within ninety days of a unilateral special education placement,

> where the request is for reimbursement of the costs
> of the placement.

Haw. Rev. Stat. § 302A-443.[3] Thus, whether the two-year or 90-day statute of limitations applies depends on whether a placement is a "unilateral special education placement." *Id.* § 302A-443(2).

### i.    Unilateral Placement

K.D. contends that a "unilateral placement" occurs only when a parent physically removes the child from public school and enrolls him or her in a private school, without DOE agreement. K.D. also asserts that his placement at Loveland was bilateral because it was agreed upon in the 2007 settlement agreement with the DOE, and that settlement agreement was not time-limited.

[9] The term "unilateral placement" is not defined by statute, and at least two Hawaii-based courts have concluded that the legislative history of Section 302A-443 is silent on the meaning of "unilateral" and "placement." *See D.C. v. Dep't of Educ.*, 550 F. Supp. 2d 1238, 1248 (D. Haw. 2008); *Makiko D. v. Hawaii*, No. 06-CV-00189, 2007 WL 11453811, at *7 (D. Haw. April 17, 2007). Nevertheless, the *Makiko D.* court defined the term as follows, based on its plain meaning: "a unilateral special education placement occurs when one party unilaterally (i.e., without consent or agreement of the other party) enrolls the student in a special education program." *Id.* at *7. For purposes of this opinion, and given the plain mean-

---

[3]The statute was amended effective July 1, 2008 to change the ninety day limitation to "one hundred and eighty calendar days." 2008 Hawaii Laws Act 179 (S.B. 2004). However, K.D.'s claim likely accrued in July 2007 when the 2007 IEP was presented and thus the request for a hearing had to be filed within 90 days. Regardless, as the district court concluded, the request was filed more than a year later, in August 2008, so it would be untimely under either the 90-day or 180-day rule if the placement was unilateral.

ing of the statute, we adopt the definition of "unilateral special education placement" used in *Makiko D*. As so defined, the term "unilateral special education placement" does not support K.D.'s contention that "placement" only occurs upon the physical removal of a student from one school to another. Here, the agreement between the DOE and K.D. ended after the 2006-07 school year, and the DOE proposed a new IEP placing K.D. at a different school. However, C.L. unilaterally decided to enroll K.D. at Loveland for the 2007-08 school year. This enrollment thus occurred "without consent or agreement of the other party." *Id.*

**[10]** K.D.'s contention that the settlement agreement is not time-limited is likewise without merit, as discussed *supra* at section I.B, in our stay put provision analysis. K.D. also argues that the settlement agreement somehow modifies K.D.'s enrollment at Loveland to be bilateral from that point forward. K.D. claims that the effect of the agreement is analogous to situations in which a hearing officer's decision in favor of the parent changes a unilateral placement to a bilateral placement. To support this argument, K.D. cites *D.C. v. Department of Education*, which held that "a favorable administrative ruling constituted the State's agreement to the private placement" and changed an otherwise unilateral placement to a bilateral placement. 550 F. Supp. 2d at 1249. However, in so holding, the *D.C.* court relied on the reasoning that we have applied to the stay put provision of the IDEA. *Id.* (citing *Burlington*, 471 U.S. at 372 (holding same in the context of the stay put provision of the IDEA) and *Clover*, 903 F.2d at 641 (holding same also in the stay put context)). Thus, just as we found that Loveland was not K.D.'s stay put placement based on the settlement agreement, we also conclude that the settlement agreement did not operate to change the placement from unilateral to bilateral.

### ii.   Timeliness of the 2007-08 School Year Claim

**[11]** Because K.D.'s enrollment at Loveland for the 2007-08 school year is a unilateral placement, the 90-day statute of

limitation applies. K.D. filed his request for an impartial due process hearing challenging the 2007 IEP on August 29, 2008. This was over a year after his enrollment at Loveland for the 2007-08 school year. Thus, K.D.'s claim requesting tuition reimbursement for the 2007-08 school year is barred by the statute of limitations in Section 302A-443(2).

## B.    The 2007 and 2008 IEPs

"[A] state must comply both procedurally and substantively with the IDEA." *M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634, 644 (9th Cir. 2005). The court must determine (1) whether the state complied with procedures set forth in the IDEA and (2) whether the state developed an IEP that is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206-07. Procedural violations may be harmless if they do not "result[ ] in a loss of educational opportunity or significantly restrict parental participation." *L.M..* 556 F.3d at 910. K.D. challenges the 2007 and 2008 IEPs on several procedural and substantive grounds.

### i.    Procedural Requirements

#### a.    Predetermined Placement

K.D.'s first procedural contention is that placement was determined prior to the 2007 IEP meeting, in violation of the IDEA. K.D. asserts that the DOE settled on Pearl Harbor Kai as a placement for K.D. about three weeks after the settlement agreement was signed in March 2007, and that the IEP team did not consider any other placement options for K.D.

[12] A school district violates the IDEA if it predetermines placement for a student before the IEP is developed or steers the IEP to the predetermined placement. *W.G. v. Bd. of Tr. of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1484 (9th Cir. 1992), superseded by statute on other grounds, as recognized in *R.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932 (9th

Cir. 2007); *see also Spielberg v. Henrico Cnty. Pub. Schs.*, 853 F.2d 256, 258-59 (4th Cir. 1988). Predetermination violates the IDEA because the Act requires that the placement be based on the IEP, and not vice versa. *Spielberg*, 853 F.2d at 259.

**[13]** Here, the fact that the DOE scouted out Pearl Harbor Kai in March of 2007 as a place of potential placement for the 2007 IEP is not conclusive evidence that the DOE had decided to place K.D. there. *See, e.g., Doyle v. Arlington Cnty. Sch. Bd.*, 806 F. Supp. 1253, 1262 (E.D. Va. 1992) (noting that school officials must come to an IEP meeting with "an open mind" but may have given thought to placement). The first 2007 IEP meeting was held on April 5, 2007, shortly after the DOE's visit to Pearl Harbor Kai. However, a review of the prior written notices of placement from the 2007 and 2008 IEPs indicates that other options were considered, including placement at Loveland, at another private school setting at Hauoli Na Kekei, and in a full inclusion class setting with same age peers without resource special education services. The DOE rejected the full inclusion class setting because K.D. required a more "distraction free environment with more specialized activities to target his learning style and rate of learning." The DOE rejected Hauoli Na Kekei because it only enrolls children with severe communication and behavioral needs, and it feared that K.D. might not develop his potential communication skills in that setting. Finally, the DOE rejected Loveland because Pearl Harbor Kai was a less restrictive environment where K.D. could receive similar services to those he was receiving at Loveland and, in addition, have immediate access to non-disabled peers in that community. Thus, the record reveals that the DOE considered other options besides Pearl Harbor Kai, reasonably rejected them, and therefore did not predetermine K.D.'s placement.

### b.    Parental Participation in the IEP Process

K.D. also argues that his parent, C.L., was deprived of an opportunity to participate in the IEP process, and that the dis-

trict court erred in blaming C.L. for not cooperating with the IEP team, and missing both the July 2007 and July 2008 IEP meetings.

**[14]** Parental participation in the IEP process is an integral part of the IDEA. *See Amanda J.*, 267 F.3d at 890-91. The regulations require the DOE to take steps to ensure that the parents of a disabled student is present at the IEP meeting, or at least afforded the opportunity to participate. 34 C.F.R. § 300.322(a). However, an IEP meeting may take place without a parent in attendance if the agency is "unable to convince the parent that they should attend." *Id.* § 300.322(d). In such a situation, the agency must "keep a record of its attempts to arrange a mutually agreed on time and place." 34 C.F.R. §§ 300.322(d)(1)-(3); *see also Shapiro ex rel. Shapiro v. Paradise Valley Unified Sch. Dist.*, 317 F.3d 1072, 1078 (9th Cir. 2003) ("[T]he school district must document phone calls, correspondence, and visits to the parents demonstrating attempts to reach a mutually agreed upon place and time for the meeting."). We conclude that the record clearly reveals that the DOE attempted to have C.L. participate in both the 2007 and 2008 IEP meetings.

C.L. and the Loveland director were in attendance at the first IEP meeting held on April 5, 2007, which was continued to July due to time constraints. C.L. and the DOE continued to correspond from May 2007 through July 2007 regarding the scheduling of tests for K.D., in preparation for his IEP. On June 28, 2007, the DOE wrote C.L. a letter reminding her that the parties had agreed to continue the April IEP meeting to July, and suggesting three possible dates for the meeting. The letter also indicated that if C.L. did not respond by July 13, 2007, the meeting would be held on July 25, 2007. C.L. signed for receipt of this letter on June 30, 2007. The DOE did not receive a response to its June 28 letter, and sent C.L. another letter on July 13, 2007 stating that because it had not heard from C.L., the meeting was scheduled for July 25, 2007. C.L. signed for receipt of this letter on July 14, 2007.

**[15]** This pre-IEP meeting correspondence shows that the DOE presented C.L. with several opportunities to raise any concerns with the proposed meeting date. The hearing officer and district court both found that, after the fact, C.L. gave conflicting stories about why she was not present at the meeting. C.L. originally testified that she was escorting her son to the mainland for the entire month of July 2007, as required by a divorce decree, but later changed her testimony, and admitted that she was in Hawaii, but contended that she could not attend the meeting because she had started a new job and needed money. The record is devoid of any evidence showing that C.L. attempted to contact the DOE to reschedule the meeting. *See Shapiro*, 317 F.3d at 1078 (finding that because the parents asked to reschedule the meeting, the school district violated the IDEA by prioritizing the schedule of its representatives over the parents). Indeed, even after the IEP meeting occurred, C.L. still failed to respond to several letters from the DOE—sent in July, August, October, December, and February, respectively—asking whether she accepted the 2007 IEP offered to K.D., and encouraging her to contact the DOE to discuss any concerns, changes, or issues regarding the IEP. We conclude that this record clearly shows that the DOE satisfied its duty to involve C.L. in the 2007 IEP process, as required under the IDEA.

Similarly, the record shows that the DOE also attempted to find a mutually acceptable time and place for the July 2008 IEP meeting. The DOE began corresponding with C.L. in preparation for the 2008 IEP meeting in May 2008, by requesting written consent to conduct observations of K.D., and requesting his performance reports. The DOE repeated its requests on June 19 and July 10, 2008. In a letter dated July 10, 2008, the DOE suggested three dates for the IEP meeting, and indicated that if no response was received before July 16, 2008, the meeting would be set for July 25, 2008. C.L. failed to respond to any of the referenced correspondence, and did not attend the July 25, 2008 meeting. Later, C.L. cited a work conflict as her reason for missing the meeting.

**[16]** As was the case with the previous year's IEP meeting, despite receiving the DOE's letters, C.L. never attempted to contact the DOE to reschedule the meeting. We conclude that the DOE satisfied its duty to involve C.L. in the 2008 IEP process, as required under the IDEA.

### ii.   Substantive Violations

We next consider whether K.D.'s 2007 and 2008 IEPs were substantively appropriate for K.D., and we conclude that they were.

### a.   The 2007 and 2008 IEPs

K.D. argues that the 2007 and 2008 IEPs did not offer adequate goals and objectives, and failed to address K.D.'s educational needs. Moreover, K.D. contends that the goals set forth in the IEPs were poorly written, not measurable, and vague.

In preparing K.D.'s 2007 IEP, the DOE conducted several tests that were documented in the IEP. These included (1) occupational therapy testing, which assessed K.D.'s motor skills, (2) academic diagnostic testing, which tested K.D.'s knowledge of body parts, colors and shapes, (3) cognitive development assessment, (4) communication testing, and (5) speech-language assessment. Based on these assessments, the IEP provided K.D. with occupational therapy services, speech/language therapy, special education, individualized instructional support, behavior intensive support services, parent training, and 1:1 after-school support. Furthermore, the IEP stated that K.D. should receive verbal/physical prompts and auditory/visual cues as needed, constant supervision and redirection to ensure that objects are not put in his mouth, and constant supervision to ensure that he remains with the class. The hearing officer concluded that the goals and treatment plan set forth in the 2007 IEP were substantially similar to the plan that was in place for K.D. at Loveland.

**[17]** K.D.'s only specific, substantive complaint about the 2007 IEP is that the DOE never offered a 1:1 skills trainer. However, both the hearing officer and the district court concluded that the prescribed individualized instructional support and 1:1 after-school support met the requirement for a 1:1 skills trainer. K.D.'s argument to the contrary is insufficient to disturb this finding in the absence of evidence that these services would not be on a 1:1 basis.

**[18]** K.D. also claims that the goals and assessment the DOE proffered are generally insufficient. We disagree. The IEP showed a focus on evaluating K.D.'s speech and communication progress—areas identified by C.L. as the areas most crucial to K.D.'s development—and offered him services like speech/language therapy and behavior intensive support to address concerns in those areas. Furthermore, with respect to goals, the IEP provided for specific goals and areas where K.D. needed to improve. For example, under fine motor skills, the IEP indicated that K.D. could not screw or unscrew a cap, turn pages one at a time, or cut with scissors, and needed assistance dressing, using the toilet, and with grooming and hygiene. Likewise, the IEP stated that K.D. needed to improve with other goals, such as to increase eye contact and to respond to social greetings and verbal cues. K.D. has not shown that the IEP the DOE provided is not "reasonably calculated to enable [him] to receive educational benefits." *Rowley*, 458 U.S. at 206-07.

The DOE prepared the 2008 IEP for K.D. based on many of the same tests considered in the 2007 IEP. K.D. faults the DOE for not conducting updated tests. However, the record shows that the DOE requested information regarding K.D.'s performance at Loveland in 2008 in order to update its test results and information about K.D.'s performance. The DOE sent C.L. letters on four separate occasions between March 14, 2008 and July 10, 2008 requesting written consent to observe K.D. at Loveland, and requesting access to his performance reports. Not having received written consent or any

records from Loveland due to C.L.'s lack of cooperation, the DOE could only prepare a 2008 IEP that was substantially similar to the 2007 IEP.

**[19]** K.D. argues that the district court erred in blaming C.L. for the DOE's inability to perform further testing in preparation for the 2008 IEP. While it is the DOE's responsibility to develop the IEP, the record shows that the DOE took reasonable steps to prepare the 2008 IEP. While C.L. testified to the hearing officer that she gave verbal consent to the DOE to observe K.D., she did not provide details on when this communication allegedly took place. In light of the letters produced by the DOE requesting consent from C.L., it appears that both the hearing officer and the district court gave C.L.'s claim little weight in reaching the decision that it was reasonable for the DOE to base the 2008 IEP largely on the 2007 tests. We find that the district court did not err, particularly in light of the documented issues between the DOE and Loveland regarding C.L.'s history of withholding and revoking consent. The 2008 IEP—like the 2007 IEP—was a FAPE.

### b. Actual Placement

K.D. also contends that he was never offered actual "placement" in either the 2007 or 2008 IEP offers, and alternatively, that any placement he may have been offered was inappropriate. Under the IDEA's regulations, a placement must be made in compliance with the following:

> (a)   The placement decision
>
>    (1) Is made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options; and

(2) Is made in conformity with the LRE provisions of this subpart, including §§ 300.114 through 300.118;

(b)  The child's placement—

   (1)  Is determined at least annually;

   (2)  Is based on the child's IEP; and

   (3)  Is as close as possible to the child's home;

34 C.F.R. § 300.116. The least restrictive environment provision (LRE) requires that the state "have in effect policies and procedures to ensure that public agencies in the state meet the LRE requirements of this section and §§ 300.115 through 300.120." *Id.* § 300.114. Hawaii Administrative Rules defines the LRE requirement as "to the maximum extent appropriate, educating students with disabilities . . . with students who are non-disabled and removing students with disabilities from the regular educational environment only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." Haw. Admin. R. § 8-60-2; *see also* 34 C.F.R. § 300.114(a)(2).

The 2007 IEP offered to K.D. specified a "free and appropriate public education at Pearl Harbor Kai elementary to be supported by an after-school program (2hrs/daily) . . . in a smaller student to teacher ratio [setting] within a fully self contained environment designed . . . especially for the students." The 2007 IEP further stated that K.D. would "participate with general education peers for the following activities, when deemed appropriate: lunch in the cafeteria, recess and school wide assemblies." The 2008 IEP offered to K.D. specified a "placement in a special education setting at Pearl Harbor Kai in a small group setting with not more than ten (10)

students of varying levels of competencies, but with language abilities that will assist in facilitating [K.D.]'s communication and social skill development." The IEP also indicated that K.D. may participate with non-disabled peers in after-school group activities and outings if deemed appropriate.

**[20]** We conclude that both the 2007 and 2008 IEPs offered K.D. actual placement. Both identified the specific school K.D. was to attend—Pearl Harbor Kai Elementary—along with a description of the classroom environment. The cases that K.D. cites for the proposition that a placement is only valid if the exact room where K.D. would be placed is specified are inapposite. In *A.K. ex rel. J.K. v. Alexandria City School Board*, 484 F.3d 672, 681 (4th Cir. 2007), the court held "as a matter of law that because [the agency] failed to identify a particular school, the IEP was not reasonably calculated to enable [the child] to receive educational benefits." In that case, the IEP only recommended a private day school, but did not specify the specific private day schools being considered. *Id.* The court reasoned that without a specific school being named, "the parents were left to fend for themselves to determine whether any private day school in their area . . . would be a satisfactory fit." *Id.* In contrast, K.D.'s IEP specified Pearl Harbor Kai as the school where he would be placed and offered that he would be placed into one of the three fully self contained classrooms that were available at the school. There was no question that he would have had a place in a classroom had he accepted the FAPE offer. Furthermore, in *Union School District v. Smith*, we held that a school district must formally offer an appropriate educational placement. 15 F.3d at 1526. In that case, the school district claimed that it did not need to do so because the parents visited the school and rejected it before a formal placement offer was actually made. *Id.* We held that the offer of placement was a "formal requirement [that] has an important purpose that is not merely technical" and that it "creates a clear record that will do much to eliminate troublesome factual disputes many years later about when placements were offered, what placements were

offered, and what additional educational assistance was offered to supplement a placement, if any." *Id.* In contrast, placement was formally offered to K.D., and any dispute that C.L. may have had with the appropriateness of the placement is immaterial to whether the placement offer was formally made.

K.D. also claims that the placement offered in Pearl Harbor Kai was not appropriate. C.L.'s advocate, who visited Pearl Harbor Kai with her in 2008, testified that she believed that the classrooms were not appropriate to meet K.D.'s needs, and were "babysitting" classes with no good role models. To the contrary, Pearl Harbor Kai's principal, Elynne Chung, testified that the school offered three fully self contained classrooms and two resource rooms. One of the classrooms had only autistic children, but autistic children were part of the other two classrooms as well. K.D. argues that the principal's testimony should be discounted because she had not reviewed K.D.'s IEP before she showed C.L. and her advocate the classrooms, and she was the only person who testified at the hearing qualified to discuss the programs offered at Pearl Harbor Kai.

However, the record shows that the district resource teacher, Aletha Sutton, also testified that she was familiar with the programs and services available at Pearl Harbor Kai. In addition, the district resource teacher testified as an expert in special education and autism, and stated that she had reviewed K.D.'s records and assessments and had an understanding of his IEP. She testified that Pearl Harbor Kai works with students with similar and lower abilities than K.D., and that one of the classrooms would be an appropriate placement for K.D. K.D. contends that Sutton's testimony should be discounted because she never assessed K.D. or worked directly with him or performed an classroom assessment of K.D. herself. However, the record reveals that Sutton additionally testified that she reviewed K.D.'s records and had observed him before he left for Loveland. The district court could properly

consider the testimony of Pearl Harbor Kai's principal and the district resource teacher, and conclude that the placement offered in one of Pearl Harbor Kai's classroom was an appropriate placement for K.D.

[21] Furthermore, the record shows that Pearl Harbor Kai was more appropriate than Loveland as the least restrictive environment for K.D. Both K.D.'s 2007 and 2008 IEPs placing him at Pearl Harbor Kai included provisions providing that he would have the opportunity to interact with non-disabled peers. In contrast, Loveland placed K.D. in a classroom with only students who had mental health or learning disabilities, and K.D. proffered no evidence indicating that he had any opportunity there to interact with his non-disabled peers. K.D.'s Loveland placement does not square with one of the main purposes behind the IDEA—to combat the "apparently widespread practice of relegating handicapped children to private institutions or warehousing them in special education classes." *N.D.*, 600 F.3d 1104 at 1115. Thus, the record evidence supports the district court's decision that K.D.'s 2007 and 2008 IEPs offered appropriate placement.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the decision of the district court.