**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

RACHEL H., by and through her Parents,

*Plaintiff-Appellant*,

v.

DEPARTMENT OF EDUCATION, STATE OF HAWAII,

*Defendant-Appellee.*

No. 14-16382

D.C. No. 1:13-cv-00263-HG-BMK

OPINION

Appeal from the United States District Court for the District of Hawaii
Helen W. Gillmor, Senior District Judge, Presiding

Argued and Submitted June 15, 2017
Honolulu, Hawaii

Filed August 29, 2017

Before: Raymond C. Fisher, Richard A. Paez and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Fisher

## SUMMARY[*]

### Individuals with Disabilities Education Act

The panel affirmed the district court's summary judgment in favor of the Hawaii Department of Education in an action brought on behalf of a student under the Individuals with Disabilities Education Act.

The panel held that there was no procedural violation of the IDEA, and the student was not denied a free appropriate public education, when the anticipated school where special education services would be delivered, in light of a planned move to a new school district, was not identified. The panel held that the IDEA does not require identification of a particular school in every instance. Rather, the requirement that an individualized education program identify the "location" in which special education services will be provided means that the IEP must identify the general setting or type of environment.

## COUNSEL

Jay S. Handlin (argued), New York, New York, for Plaintiff-Appellant.

Kaliko'onalani D. Fernandes (argued), Holly T. Shikada, and Gary S. Suganuma, Deputy Attorneys General; Clyde J. Wadsworth, Solicitor General; Douglas C. Chin, Attorney

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

General; Department of the Attorney General, Honolulu, Hawaii; for Defendant-Appellee.

## OPINION

FISHER, Circuit Judge:

Rachel H.'s parents brought suit on her behalf against the Hawaii Department of Education, alleging she was denied a free appropriate public education under the Individuals with Disabilities Education Act (IDEA). This alleged denial did not stem from any substantive failure to include any particular special education service in her individualized education program. Rather, Rachel's parents argued their daughter was denied a free appropriate public education because of a purported procedural error, specifically, not identifying the anticipated school where special education services would be delivered in light of a planned move to a new school district. Because we hold the IDEA does not require identification of a particular school in every instance, we affirm the district court's summary judgment for the Hawaii Department of Education.

## I.

Rachel has Down syndrome, but this has not stopped her from spending "her entire educational life fully included with typical students in a general education setting." In 2012, Rachel was finishing ninth grade at a private school paid for, in part, by the Hawaii Department of Education (Department) under a settlement agreement with Rachel's parents. In May of that year, the Department held an individualized education program (IEP) meeting to determine the special education services Rachel would receive in the upcoming school year. During the meeting,

Rachel's father urged the Department to continue paying for Rachel's tuition at the private school, but the Department declined.  Although agreeing that Rachel qualified for numerous special education services, including one-on-one adult support, the Department's offer of a free appropriate public education (FAPE) provided that her IEP would be "implemented on a public school campus."

At the time of the May 2012 IEP meeting, all parties involved understood that the "public school campus" offered by the Department was Kalani High School.  However, neither Rachel's IEP nor the prior written notice of the proposed changes formally identified the anticipated school where Rachel's tenth grade IEP would be implemented.

Rachel's parents did not sign the May 2012 IEP.  A few months later, Rachel's father informed the Department that the family was moving to Kailua, approximately 20 to 30 miles from Kalani High School.  Consequently, according to Rachel's father, "Kalani [would] under no circumstances be Rachel's local public high school" given the distance from the school to their new home.  He again demanded to enroll Rachel in private school at public expense.

The Department did not accede to this demand.  On July 30, 2012, it wrote Rachel's parents that the May 2012 IEP was "not specific to Kalani High School."  Instead, the IEP was "based on [Rachel's] current strengths and needs." Accordingly, the Department asked for the family's new address in Kailua "so the location where Rachel's IEP can be implemented can be determined."  "Until [the family's] move," Rachel could attend Kalani High School if her parents wished.  The Department also informed Rachel's father that, should he enroll her in private school, such

enrollment would be considered a "unilateral placement at parents' expense."

The Department never proposed a new IEP meeting in light of the family's move.  Nor did it ever identify a school in Kailua that could meet Rachel's special education needs.  It did, however, repeatedly ask for the family's new address.  Rachel's father ignored these requests until January 2013, when, in addition to giving the Department the family's new address, he filed a due process hearing request on behalf of Rachel, arguing that the Department had denied Rachel a FAPE by not identifying the anticipated school where Rachel's IEP would be implemented.  He did not raise any substantive challenge to Rachel's IEP.  In response, the Department argued it had complied with the IDEA's requirements and that Rachel's IEP could "be implemented on a public school campus."

An administrative hearings officer concluded that the May 2012 IEP had offered Rachel placement at Kalani High School and that the July 30, 2012 letter had not amended that offer to include any public school in Kailua.  Instead, he viewed the July letter as a first step in determining which school in Kailua could serve Rachel's needs while continuing to offer Kalani High School as an option in the interim.  After Rachel's parents filed this action in federal court for review of the hearings officer's decision, the district court affirmed, reasoning that an IEP need not necessarily identify a specific school where it would be implemented to comply with the IDEA.  Rachel timely appealed.

## II.

Congress enacted the IDEA because many children with disabilities "were excluded completely from any form of

public education or were left to fend for themselves in classrooms designed for education of their nonhandicapped peers." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 191 (1982). To remedy this problem, Congress offered states federal money and, in exchange, required states to provide a FAPE to all children with qualifying disabilities through the provision of special education services. *See* 20 U.S.C. § 1412(a)(1). These special education services must be outlined in an IEP, "the centerpiece of the statute's education delivery system." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)). Each IEP is crafted by a team of the individuals most critical to a child's success, including parents, teachers, and school officials. *See* 20 U.S.C. § 1414(d)(1)(B). Their task is to develop a "comprehensive plan" that is "'tailored to the unique needs' of a particular child." *Endrew F.*, 137 S. Ct. at 994 (quoting *Rowley*, 458 U.S. at 181).

A complete IEP that is fully compliant with the IDEA must be in place at the beginning of each school year for all children with disabilities. *See* 20 U.S.C. § 1414(d)(2)(A). The IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999. To accomplish this goal, the IEP team must consider a child's current levels of academic achievement, describe how a child's disability affects his or her ability to perform, and set measurable goals of academic progress for the upcoming year through the provision of special education services. *See* 20 U.S.C. § 1414(d)(1)(A)(i). As relevant here, an IEP must contain "the projected date for the beginning of the services and modifications described in subclause (IV), and the anticipated frequency, *location*, and duration of those

services and modifications." *Id.* § 1414(d)(1)(A)(i)(VII) (emphasis added).[1]

This appeal concerns the meaning of "location" in § 1414(d)(1)(A)(i)(VII). If, as Rachel's father argues, "location" means the specific school where an IEP will be implemented, then at the beginning of the 2012–13 school year the Department failed to have in place an IEP that identified an anticipated school in Kailua, Rachel's new home town, where special education services would be delivered. If, on the other hand, "location" does not mean the specific school, then the district court correctly affirmed dismissal of Rachel's claims. We hold "location" does not necessarily include the specific school where special education services will be implemented. We therefore affirm.

The IDEA does not define the term "location." *See* 20 U.S.C. § 1401. "When interpreting a statute, the court begins with the statutory text and interprets 'statutory terms in accordance with their ordinary meaning, unless the statute clearly expresses an intention to the contrary.'" *I.R. ex rel. E.N. v. L.A. Unified Sch. Dist.*, 805 F.3d 1164, 1167 (9th Cir. 2015) (quoting *United States v. Neal*, 776 F.3d 645, 652 (9th

---

[1] 20 U.S.C. § 1414(d)(1)(A)(i)(IV) says an IEP must include "a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child – (aa) to advance appropriately toward attaining the annual goals; (bb) to be involved in and make progress in the general education curriculum in accordance with subclause (I) and to participate in extracurricular and other nonacademic activities; and (cc) to be educated and participate with other children with disabilities and nondisabled children in the activities described in this subparagraph."

Cir. 2015)).  Here, the ordinary dictionary definitions of the term "location" do not reveal what Congress intended by the term in this context.  *See Location*, American Heritage Dictionary 1029 (5th ed. 2011) ("A place where something is or could be located . . . ."); *Location*, Black's Law Dictionary (10th ed. 2014) ("The specific place or position of a person or thing."); *Location*, Webster's Third New International Dictionary 1327 (2002) ("a position or site occupied or available for occupancy (as by a building) or marked by some distinguishing feature <a sheltered ~>").  These definitions generally define "location" as a specific place or position.  In the context in which the term is used in § 1414(d)(1)(A)(i)(VII), this could plausibly refer to a specific school, a specific classroom, or a specific type of classroom or educational environment—such as a regular classroom, a special education classroom or a resource room.  The ordinary meaning of the term location therefore does not resolve the question presented here.  We therefore turn to the tools of statutory interpretation employed to give meaning to a statute's ambiguous terms.

The United States Department of Education (USDOE), charged with enforcing the IDEA, also has not defined the term.  *See* 34 C.F.R. §§ 300.4–45.  Nor has it officially interpreted its regulations concerning the term "location" as used in 20 U.S.C. § 1414(d)(1)(A)(i)(VII) and 34 C.F.R. § 300.320(a)(7).  In unofficial commentary, however, the USDOE has given the term "location" a meaning inconsistent with holding it always includes a particular school.

Shortly after the location requirement was added to the IDEA, the USDOE responded to commenters' requests to clarify that "'location' means the general setting in which [special education] services will be provided and not a

particular school or facility." Assistance to States for the Education of Children with Disabilities, 64 Fed. Reg. 12,406, 12,594 (Mar. 12, 1999). The USDOE responded, "[t]he 'location' of services in the context of an IEP generally refers to the type of environment that is the appropriate place for provision of the service. For example, is the related service to be provided in the child's regular classroom or in a resource room?" *Id.* This statement, especially when read in the context of the request from commenters to which it was designed to respond, strongly suggests the USDOE did *not* interpret location to require identification of a particular school. *See T.Y. ex rel. T.Y. v. N.Y. City Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir. 2009) (concluding the USDOE's commentary "indicate[s] that the term 'location' does not mean the specific school location, but the general environment of the overall program"); *see also R.L. ex rel. O.L. v. Miami-Dade Cty. Sch. Bd.*, 757 F.3d 1173, 1190 n.8 (11th Cir. 2014) (concluding "particular site selection" for an educational "placement" is "likely within the state's discretion to choose"); *White ex rel. White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 379–80 (5th Cir. 2003) (concluding the term "location" was "primarily administrative" and did not give parents the right to be involved in "site selection"); *Abney ex rel. Kantor v. District of Columbia*, 849 F.2d 1491, 1492 n.1 (D.C. Cir. 1988) ("An IEP is not location-specific; the place at which an IEP is implemented may change without the IEP itself changing."); *cf. A.K. ex rel. J.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672, 681 (4th Cir. 2007) (not considering the USDOE commentary and concluding location, in some circumstances, means the anticipated school where special education services will be delivered). We conclude the USDOE's understanding of the term "location" as meaning "type of environment that is the appropriate place for

provision of [a special education] service" is persuasive for at least two reasons.[2]

First, the USDOE's interpretation is almost identical to a statement in the legislative history of the "location requirement," which Congress added in 1997.  *See* Pub. L. No. 105-17, title I, § 614, 111 Stat. 37.  A Senate Labor and Human Resources Committee report said the amendment was needed because:

> The location where special education and related services will be provided to a child influences decisions about the nature and amount of these services and when they should be provided to a child.  For example, the appropriate place for the related service may be the regular classroom, so that the child does not have to choose between a needed service and the regular educational program.  For this reason, in the bill the committee has added "location" to the provision in the IEP that includes "the projected date for the beginning of services and modifications, and the anticipated frequency, *location*, and duration of those services" (emphasis added).

S. Rep. No. 105-17, at 21–22 (1997).  Thus, like the USDOE commentary, the legislative history suggests Congress

---

[2] Because we conclude the USDOE's commentary is persuasive under *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40 (1944), we do not consider whether the USDOE's commentary is entitled to greater deference.  *See E.M. ex rel. E.M. v. Pajaro Valley Unified Sch. Dist. Office*, 758 F.3d 1162, 1174 (9th Cir. 2014).

intended the term "location" to mean the appropriate educational environment for the delivery of a specific special education service.

Second, the USDOE's interpretation is consistent with other IDEA provisions. When a student transfers to a new school district within the same academic year, the new district may use the old IEP until the new district "adopts the previously held IEP or develops, adopts, and implements a new IEP that is consistent with Federal and State law." 20 U.S.C. § 1414(d)(2)(C)(i)(I). Accordingly, the IDEA's transfer procedures allow a new district to adopt an old IEP *without changes*. This procedure supports the USDOE's interpretation of "location" as the appropriate environment for delivery of a special education service. Otherwise, this subsection would suggest that a new school district could adopt an IEP without changing the previously designated school, which might well be outside the new district and over which the local educational agency lacks authority.

Contrary to the USDOE's interpretation, Rachel's father provides three arguments for why the term "location" must always require identification of the anticipated school where special education services will be delivered. None is persuasive.

First, Rachel's father argues *K.D. ex rel. C.L. v. Department of Education*, 665 F.3d 1110, 1126–27 (9th Cir. 2011), holds location means the anticipated school where special education services will be delivered. We disagree. The word "location" does not even appear in *K.D. See id.* Instead, that case concerned whether a local educational agency must identify the specific classroom where special education services would be provided under *Union School District v. Smith*, 15 F.3d 1519, 1526 (9th Cir. 1994), as part

of its formal offer of "placement." *K.D.*, 665 F.3d at 1127.**[3]**
*K.D.* held there was no requirement to identify the specific
classroom where special education services would be
provided. *See id.* Because a specific school was identified
in K.D.'s IEP, there was no need to consider whether the
IDEA required such identification. *See id.*

Second, Rachel's father argues the USDOE's
interpretation of "location" would strip the term "placement"
of meaning. Not so. The USDOE's interpretation of
location concerns the environment in which a particular
special education service will be provided. *See* 64 Fed. Reg.
at 12,594. Conversely, the term "placement" means the
"general educational program of the student." *N.D. ex rel.
Parents Acting As Guardians Ad Litem v. Haw. Dep't of
Educ.*, 600 F.3d 1104, 1116 (9th Cir. 2010). In other words,
the term "location" is narrower. For example, the
educational placement of a student might be regular classes
with a one-on-one aide and modified testing. *See* 34 C.F.R.
§ 300.115(b)(1). Conversely, the location of a special
education service, such as modified testing, might be in a
teacher's office. One need not interpret "location" as

---

**[3]** In supplemental briefing, Rachel's father appears to have
abandoned any argument that *Smith* is dispositive of this case. To the
degree Rachel's father maintains that *Smith* is dispositive, we disagree.
*Smith* could not have interpreted the term "location" because it was
decided three years before Congress added the location requirement to
the IDEA. Instead, *Smith* interpreted the term "placement" now codified
at 20 U.S.C. § 1415(b)(3) and (b)(6)(A). *See Smith*, 15 F.3d at 1526. In
so doing, it held an IEP that identified an inappropriate school could not,
nonetheless, provide a FAPE because a different school not identified
and never offered could have met the needs of a child with disabilities.
*See id.* Thus, the court held a local educational agency must make a
formal offer of placement in order to satisfy IDEA requirements. *See id.*
It did not hold that "placement" meant a particular school. *See id.*

meaning an anticipated school for there to be a difference between it and the term "placement."

Lastly, Rachel's father argues that permitting an educational agency to not always identify a particular school at which services will be provided would deprive parents of children with disabilities of basic information concerning an offer of a FAPE. *Cf. A.K.*, 484 F.3d at 681. Although we agree that having a local educational agency identify the school where special education services will be delivered makes sense and may even be required in some circumstances, we do not agree the IDEA requires such identification in *all* instances, as we have explained.

When a student with an existing IEP transfers to a new district within the same state, the new district must "provide such child with a free appropriate public education, including services comparable to those described in the previously held IEP, in consultation with the parents until such time as the local educational agency adopts the previously held IEP or develops, adopts, and implements a new IEP that is consistent with Federal and State law." 20 U.S.C. § 1414(d)(2)(C)(i)(I). Here, had Rachel's parents provided the Department with their new address, "[t]here [is] no question that [s]he would have had a place," *K.D.*, 665 F.3d at 1127, in a school and—accepting Rachel's father's interpretation of the July 2012 letter as true—a public one at that. That public school must have provided Rachel a FAPE in a manner that was consistent with her existing IEP—*i.e.*, the one created with Kalani High School in mind. *See* 20 U.S.C. § 1414(d)(2)(C)(i)(I). But instead of undergoing a normal registration process with the educational agency in Kailua, Rachel's parents decided to treat a purported technical violation of the IDEA as allowing them to unilaterally enroll their daughter in private school at

public expense without identifying a single special education need her existing IEP failed to meet simply because the existing IEP did not specify Kalani High School and thereby limit the IEP to that location.  Because the IDEA does not require educational agencies to identify a specific school in every IEP, this gambit must fail.

We emphasize that knowledge of a particular school, classroom, or teacher may well be relevant to allowing parents to participate meaningfully in the IEP process.  *See, e.g.*, *A.K.*, 484 F.3d at 681 ("With the IEP not identifying any particular school (because the IEP team had not discussed the issue), the parents were left to fend for themselves to determine whether any private day school in their area—including the five ACPS applied to—would be a satisfactory fit.  This is not how the IDEA was designed to work.").  Parents may need this information, for example, to evaluate whether a proposed IEP satisfies the IDEA because of a particular special education need caused by a child's disability.  *See, e.g.*, *Smith*, 15 F.3d at 1525 (holding the absence of other autistic children and the lack of training for teachers on working with autistic children, among other deficiencies, made a particular school inappropriate).  In such circumstances, a local educational agency's failure to specify a school may violate the IDEA.  Furthermore, even where the IDEA may not require identification of a particular school, it may still be wise to do so in the IEP, especially when providing this information would advance the essential purpose of this important law.  Nothing in our holding is meant to suggest otherwise.  *See A.K.*, 484 F.3d at 680–82.

Rather, we hold an educational agency does not commit a per se violation of the IDEA by not specifying the anticipated school where special education services will be

delivered within a child's IEP. This does not mean "school districts have carte blanche to assign a child to a school that cannot satisfy the IEP's requirements." *T.Y.*, 584 F.3d at 420. Nor does it mean that not identifying a school can never result in a denial of a FAPE, especially when a child's disability demands delivery of special education services at a particular facility. We hold only that the IDEA does not procedurally require every IEP to identify the anticipated school where special education services will be delivered.

## III.

Rachel's father argues that even if the IDEA does not require a local educational agency to identify a particular school in every instance, Rachel's predetermination claim still survives because the July 2012 letter indicated Rachel would have to attend a Kailua public high school without holding an IEP meeting and without considering whether any particular public schools in Kailua could meet her needs. "A school district violates the IDEA if it predetermines placement for a student before the IEP is developed or steers the IEP to the predetermined placement." *K.D.*, 665 F.3d at 1123. We conclude that did not occur here.

Rachel's May 2012 IEP said her needs could be met "on a public school campus." As of May, the parties understood the IEP would be implemented at Kalani High School, although the IEP itself was "not specific to Kalani High School." Thus, as a result of that May 2012 IEP process—which has not been challenged—the Department concluded Rachel's needs could be met "on a public school campus," and Kalani High School was the presumed school at that time. Accordingly, even if the July 2012 letter definitively said Rachel would be sent to a public school in Kailua, this would be a simple adoption of her May 2012 IEP in a new school district. This is precisely the procedure outlined in

20 U.S.C. § 1414(d)(2)(C)(i)(I).**[4]**    As stated above, § 1414(d)(2)(C)(i)(I) provides that when a student with an existing IEP transfers to a new district within the same state, the new district may use the old IEP to offer a FAPE until it either chooses to adopt the old IEP in full or develops a new one with parental input.

**AFFIRMED**.

---

**[4]** Because Rachel's IEP called for its implementation "on a public school campus," offering the special education services and modifications outlined therein in a Kailua public school would have simply followed the procedure outlined in § 1414(d)(2)(C)(i)(I), even though the special education services and modifications in Rachel's May 2012 IEP were designed with Kalani High School in mind.